IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 16-cv-01461-RBJ

ELIZABETH SIMMONS,

      Plaintiff,

v.

BOYS & GIRLS CLUB OF THE PIKES PEAK REGION, a Colorado corporation, and
JAMES M. SULLIVAN III, an individual,

      Defendants.

---

## ORDER ON PENDING MOTIONS

---

This matter is before the Court on plaintiff Elizabeth Simmons' motion for partial

summary judgment, ECF No. 21, and defendants Boys & Girls Club's and James M. Sullivan's

motion for summary judgment, ECF No. 27. For the reasons below, the Court denies plaintiff's

motion and grants in part and denies in part defendants' motion. Additionally, as explained

below, plaintiff's motion for leave to amend to add a claim for exemplary damages, ECF No. 22,

is mooted by this order.

### BACKGROUND

In August 2014 the Boys & Girls Club of the Pikes Peak Region ("Boys & Girls Club")

hired Elizabeth Simmons as a Teen Coordinator at its E.A. Tutt facility. ECF No. 27 at 2. The

position was originally classified as exempt from the Fair Labor Standards Act's ("FLSA")

overtime requirements, so Ms. Simmons did not receive overtime pay. *Id.* However, Boys &

Girls Club later reclassified the position as non-exempt and paid Ms. Simmons $947.76, which it believes more than compensated for her prior overtime hours. *Id.*

In April 2015 Ms. Simmons became the Branch Director of the E.A. Tutt Club. *Id.* at 3. This role was also classified as exempt from the FLSA's overtime requirements, though Ms. Simmons disputes this exemption. ECF No. 27 at 4; ECF No. 28 at 3–4.

Boys & Girls Club receives funding through Boys & Girls Club of America that originates from the Office of Justice Programs ("OJP"), a federal agency. ECF No. 27 at 4; ECF No. 28 at 5. These funds are referred to as OJP grants. ECF No. 27 at 4. In May 2015 Mr. Sullivan—Boys & Girls Club's CEO—accepted an OJP grant for $7,500 on behalf of Boys & Girls Club for amounts expended or obligated from January to December 2015. ECF No. 27 at 5. The terms of this OJP grant, which were outlined in a "letter of agreement," required Boys & Girls Club to mentor at least eight youths with connections to the military. ECF No. 28-12 at 1. The grant also required that at least one Boys & Girls Club staff person participate in specific trainings. *Id.* at 2.

In August 2015 Ms. Simmons met with Boys & Girls Club's Director of Operations, Sherrel Bethel, to review this OJP grant's requirements. ECF No. 27 at 6. Ms. Bethel indicated that Boys & Girls Club staff should mentor youth in the Club two days per week and keep written logs of their meetings and progress. ECF No. 27-6 at 126:4–24. Ms. Bethel mistakenly informed Ms. Simmons that Boys & Girls Club would need to return the grant money if it did not mentor the requisite number of military youth. ECF No. 27-8 at ¶ 7.

Ms. Bethel also informed Ms. Simmons that she was required to complete an online training by December 2015. ECF No. 27-6 at 127:10–18. In September 2015 Ms. Simmons

reported to Ms. Bethel that she had not yet conducted the training.  ECF No. 27 at 6–7.  When Ms. Simmons reported to Ms. Bethel that she still had not completed the training at the end of December 2015, Ms. Bethel instructed her not to complete the training.  *Id.* at 7.  Ms. Simmons contends that she did not understand its importance.  ECF No. 28 at 5.

As noted, Ms. Simmons was required to fill out reports related to the OJP grants.  ECF No. 27 at 5; ECF No. 28 at 5.  In December 2015 Ms. Bethel instructed Ms. Simmons to "backdate" information on a grant report, meaning that she should write about mentoring sessions—that Ms. Simmons alleges did not occur—for youths dating back to August 2015. ECF No. 27 at 7; ECF No. 28 at 6.  Ms. Bethel informed Ms. Simmons that Mr. Sullivan had instructed her that Boys & Girls club would not pay the grant money back, so they would need to backdate the forms.  ECF No. 27-6 at 137:23–138:9.  During this conversation, Ms. Simmons raised concerns about backdating, noting her belief that doing so was a federal crime, and she told Ms. Bethel she would not backdate.  *Id.*  Ms. Simmons again refused to backdate in early March 2016 during a meeting with Ms. Bethel and three co-workers.  *Id.* at 236:22–237:8. During Ms. Simmons' employment, Ms. Bethel avers that she did not tell Mr. Sullivan about Ms. Simmons' backdating concerns; Mr. Sullivan similarly avers that he did not know of her concerns during her employment.  ECF No. 27-8 at ¶ 11; ECF No. 27-2 at ¶12.

Mr. Sullivan learned about Ms. Simmons' failure to complete the OJP training on March 8, 2016.  ECF No. 27 at 8.  Boys & Girls Club of America sent him an email inquiring whether his staff had completed the required training, at which point Ms. Bethel informed Mr. Sullivan that Ms. Simmons had failed to do so.  *Id.*  At a meeting with Ms. Simmons on March 9, 2016, Mr. Sullivan decided to terminate her employment based on her failure to complete the training.

3

*Id.* Mr. Sullivan contends that he also took into account her attitude and prior disciplinary record. ECF No. 27-2 at ¶11. This record included a report from October 2014 in which Ms. Simmons was alleged to have displayed unprofessional conduct during a training and a report from September 2015 in which she was alleged to have engaged in three unprofessional incidents. ECF No. 27-7 at 15–17. Plaintiff counters that Mr. Sullivan was only aware of her October 2014 disciplinary report. ECF No. 27 at 8; ECF No. 28 at 10.

Ms. Simmons filed this lawsuit against Boys & Girls Club and Mr. Sullivan, alleging violations of the FLSA and the Colorado Minimum Wage Order, extreme and outrageous conduct, and wrongful discharge in violation of public policy and the False Claims Act. ECF No. 5. In my previous order on defendants' motion for judgment on the pleadings, I dismissed plaintiff's claim under the Colorado Minimum Wage Order and her FCA retaliation claim against Mr. Sullivan. ECF No. 30. Defendants now move for summary judgment on all claims, ECF No. 27, while plaintiff moves for summary judgment on part of one claim, ECF No. 21.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the

4

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court will

examine the factual record and make reasonable inferences in the light most favorable to the

party opposing summary judgment.  *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36

F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

Plaintiff seeks summary judgment on her FLSA claim for her employment as a Teen

Coordinator, ECF No. 21, while defendants move for summary judgment on all claims and

incorporate their response to plaintiff's motion for that claim, ECF No. 27.  These motions will

therefore be addressed together, and each of the claims will be addressed below.

### A.  <u>FLSA: Teen Coordinator.</u>

Plaintiff moves for summary judgment on her FLSA claim for $947.76 in unpaid

overtime and liquidated damages due for her employment as a Teen Coordinator, as well as for

reasonable attorneys' fees and costs.  ECF No. 21 at 7.  Defendant Boys & Girls Club also

moves for summary judgment on this claim, arguing that it has satisfied any amounts allegedly

owed to plaintiff as unpaid overtime and liquidated damages.  ECF No. 27 at 9.  As an aside, I

question the parties' exercise of good judgment in devoting so much time and, presumably,

expense to litigation about what at most is a $947.76 item.

Plaintiff argues that it is undisputed that she was a non-exempt employee during her

tenure as a Teen Coordinator, that her hours were reported correctly, and that she is entitled to

liquidated damages.  ECF No. 21 at 1–2.  She accepts Boys & Girls Club's initial payment of

$947.76 in overtime wages but demands an equal amount in liquidated damages.  *Id.* at 7.  She

alleges that liquidated damages are justified here due to Boys & Girls Club's failure to allege a good faith belief in its previous misclassification of her role.  *Id.*

Defendants concede that Boys & Girls Club's initial overtime payment was based on the timekeeping records that plaintiff submitted.  ECF No. 21 at 2.  However, they now argue that her overtime hours and wages were improperly calculated, and that under the "fluctuating workweek method," she was only due $218.74 in unpaid overtime.  Doubling that for liquidated damages, plaintiff would be owed only $437.48.  Therefore, defendants suggest that Boys & Girls Club's payment of $947.76 in fact over compensated plaintiff for her overtime wages and liquidated damages.  *Id.*  Alternatively, defendants argue that even under Boys & Girls Club's previous method of calculating her hourly wage, plaintiff would still have been overcompensated once personal time off (PTO) and holiday payments that she was improperly paid (while misclassified as exempt) are accounted for.[1]  *Id.* at 13–14.

The Court determines that the method Boys & Girls Club initially used to calculate Ms. Simmons' overtime was a reasonable method to be used with respect to her Teen Coordinator position, and that even if it were not the correct method, Boys & Girls Club waived the use of alternative methods.  The Court further finds that defendants have failed to come forward with any evidence of a good faith reason for their initial misclassification of plaintiff's role as Teen Coordinator.  Therefore, Ms. Simmons is entitled to liquidated damages.  The Court is unable to determine on the present record whether any adjustment should be made for PTO or holiday

---

[1] In their response, defendants also ask the Court to dismiss plaintiff's FLSA claim with respect to her Teen Coordinator role.  Such a request is improper in a motion for summary judgment.  *See* D.C. COLO.LCivR 7.1(d).

time, or if so, in what amounts, and to that extent only, plaintiff's motion for summary judgment

on the Teen Coordinator issue is denied.  Defendant's motion is denied as to this issue.

### B.  FLSA: Branch Director.

Next, defendants argue that plaintiff was properly characterized as exempt from the

FLSA overtime requirements during her tenure as a Branch Director.  Employers need not pay

overtime if an employee is "'employed in a *bona fide* executive, administrative, or professional

capacity' as defined by the regulations promulgated by the Secretary of Labor."  *Reyes v.*

*Snowcap Creamery, Inc.*, No. 11-CV-02755-WJM-KMT, 2013 WL 4229835, at *2 (D. Colo.

Aug. 14, 2013).  Although employees bear the burden of proving that their employer violated the

FLSA, an employer who asserts that an employee is exempt under the "executive exemption"

"bears the burden of establishing that such category applies."  *Id.* (quoting *Archuleta v. Wal-*

*Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008)).  "The exceptions to FLSA's overtime

requirement are construed strictly against the employer."  *Id.*

The requirements to qualify for the executive exemption are outlined at 29 C.F.R. §

541.100: (1) an employee must be compensated on a salary basis at a rate not less than $455 per

week;[2] (2) the employee's primary duty must be management of the enterprise or of a

customarily recognized department or subdivision of the enterprise; (3) the employee must

customarily and regularly direct the work of two or more other employees; and (4) the employee

must have the authority to hire or fire other employees, or the employee's suggestions and

---

[2] The parties did not mention the updated regulation (effective December 1, 2016) wherein compensation
is calculated according to § 541.600 "at a rate per week of not less than the 40th percentile of weekly
earnings of full-time non-hourly workers in the lowest-wage Census Region."  I will assume that the
applicability of the $455 rate is not disputed.

recommendations as to hiring, firing, or any other change of status of other employees must be given particular weight.  29 C.F.R. § 541.100.

Because an employer must show that an employee met all four requirements to be found exempt under the executive exemption, plaintiff need only establish a genuine issue of fact as to one of these requirements to preclude summary judgment on this claim.  Plaintiff concedes that there is no issue of fact with respect to the third requirement, but she argues that her employment as Branch Director did not meet the first, second, or fourth requirements.  *See* ECF No. 28 at 11–12 (citing 29 C.F.R. § 541.100(a)).  Because, as set forth below, I agree that there is a genuine factual dispute as to at least the second requirement—that the plaintiff's primary duty was managing the enterprise—summary judgment is not appropriate on this issue.

The parties dispute whether plaintiff's primary duty was managing a department of the enterprise.  Defendants contend that plaintiff's primary duty was managing the Tutt branch, including overseeing day-to-day operations of the facility and supervising services provided to children.  ECF No. 27 at 10.  Plaintiff argues that her primary duty was watching over children. ECF No. 28 at 13.

The FLSA regulations provide a non-exclusive list of "management" activities, including:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the

safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. "An employee's 'primary duty' is management if it is the 'principal, main, major or most important duty that the employee performs." *Reyes*, 2013 WL 4229835, at *3 (quoting 29 C.F.R. §541.700(a)). To determine an employee's primary duty, the Court may consider, among other factors,

> (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a) (numbers added). Additionally, although the amount of time spent on exempt work "can be a useful guide" in determining whether that work is the employee's primary duty, "it is not the sole test," and there is no requirement "that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* § 541.700(b).

On one hand, there is evidence that Ms. Simmons was responsible for the "day-to-day operations of the Club," including "[i]f anything went wrong maintenance-wise" and "making sure that the group leads were running the programs like they were supposed to be." ECF No. 28-3 at 72:3–11. She was the only onsite manager of the site and ran weekly meetings. ECF No. 27-6 at 75:12–15, 92:20–93:21. Additionally, she "took the money and tracked the attendance in the computer system and speak [sic] with the parents." ECF No. 28-3 at 73:10–12. She also signed time sheets and vacation requests and notified her superiors when supplies or repairs were needed. ECF No. 27-6 at 94:2–14, 98:6–99:10.

On the other hand, plaintiff was not involved in interviewing, selecting, or training employees, nor was she authorized to discipline them or to set or adjust their rate of pay or hours.

*See* ECF No. 27-6 at 77:16–80:17, 89:1–9 (plaintiff participated in only one interview during her tenure as Branch Director during which she just listened; she was not in charge of hiring or firing staff; she could not discipline staff herself but took her complaints to her superior; and she did not provide training to employees). *See also* ECF No. 28-4 at 23:18–24:3, 25:18–20 (Branch Directors did not have the authority to change a Group Lead's rate of pay, and a Branch Director had never hired or fired an employee since Ms. Bethel became the Director of Operations). One of plaintiff's "primary responsibilities" was interacting with the children in the program, just as it had been when she was a Teen Coordinator. ECF No. 27-6 at 72:12–25.

Additionally, defendants have not met their burden with respect to the four regulatory factors the Court may consider. With respect to the relative importance of and amount of time spent on her managerial duties as compared with other types of duties, defendants contend that the "vast majority of her time" was spent in management duties. ECF No. 27 at 10. However, there appears to be no evidence supporting that contention aside from defendants' assumptions about how long various activities might have taken plaintiff. Plaintiff testified that managerial duties constituted less than 50 percent of her time, and that she spent most of her time "watching over children." ECF No. 28-2 at 2. Although the Court notes that "time is not the sole test," it is a factor the Court may consider, and plaintiff has provided sufficient evidence disputing defendants' contention with respect to that factor, and relatedly, the relative importance of her managerial duties.

With respect to the degree of supervision to which plaintiff was subject, defendants note that plaintiff was the only Branch Director at her site, and thus was free from direct supervision. ECF No. 28-3 at 75:12–15. However, plaintiff has provided sufficient evidence of her frequent

contact with her superiors for their input and approval on a variety of topics, from maintenance and inventory needs to staff disciplinary situations.  *See, e.g.*, ECF No. 28-3 at 72:5–11, 92:14–18, 94:7–10, 98:18–99:9.  Moreover, plaintiff's own disciplinary record suggests that she was subject to at least some direct supervision.  *See* ECF No. 27-7 at 9, 15, 16.

Finally, with respect to her salary as Branch Director as compared to the wages paid to other employees for the same kind of nonexempt work she performed, defendants argue that plaintiff was entitled to benefits and paid vacations to which non-exempt employees were not entitled.  However, plaintiff counters that her wage as a Branch Director was only 22 percent higher than her wage as a Teen Coordinator.  ECF No. 28 at 12 n.7 (citing ECF No. 28-18).  When considered along with the other factors, this difference in her salary contributes to a genuine issue as to whether plaintiff's primary duty was management.

**C.  Extreme and Outrageous Conduct.**

Mr. Sullivan next contends that plaintiff's claim of outrageous conduct against him fails as a matter of law.  In this claim, plaintiff contends that Mr. Sullivan "engaged in extreme and outrageous conduct by, among other things, directing Ms. Simmons to defraud the government," "recklessly or with the intent of causing Ms. Simmons severe emotional distress," and that plaintiff "in fact suffered severe emotional distress" for which Mr. Sullivan is liable.  ECF No. 5 at 8.

Plaintiff may establish a this claim by showing that Mr. Sullivan "'by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress'" to plaintiff.  *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970) (quoting Restatement (Second) of Torts § 46 (1965)).  Thus, plaintiff must prove that (1) Mr. Sullivan engaged in extreme and outrageous

11

conduct; (2) Mr. Sullivan did so recklessly or with the intent of causing severe emotional distress; and (3) plaintiff suffered severe emotional distress because of Mr. Sullivan's conduct. *See Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877 (Colo. 1994).

Liability for severe emotional distress is found only where the defendant's conduct "'has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Rugg*, 476 P.2d at 756 (quoting Restatement (Second) of Torts, comment d at 73). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery," but "[w]here reasonable men may differ," that question is for the jury. *Blackwell v. Del Bosco*, 536 P.2d 838, 841 (Colo. App. 1975) (quoting Restatement (Second) of Torts §46 (1965)). "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Culpepper*, 877 P.2d at 883.

Because plaintiff must satisfy all three elements of the extreme and outrageous claim, Mr. Sullivan can justify a grant of summary judgment by establishing that he is entitled to judgment as a matter of law with respect to any one of the three elements. I find that plaintiff has not come forward with evidence from which a reasonable jury could find that Mr. Sullivan engaged in extreme and outrageous conduct.

Plaintiff alleges that there is a triable issue of fact with respect to whether Mr. Sullivan engaged in extreme and outrageous conduct because he ordered Ms. Bethel to backdate and fabricate information related to OJP grants; Ms. Bethel instructed plaintiff to "sign off on OJP

documentation;" and Mr. Sullivan terminated plaintiff's employment because she refused.  ECF No. 28 at 14.  Plaintiff argues that an average member of the community would find this evidence outrageous if true.  However, plaintiff has failed to provide sufficient evidence to substantiate these claims.

As discussed below in the context of plaintiff's FCA retaliation claim, she has not provided any evidence that Mr. Sullivan knew about her backdating concerns at the time he decided to terminate her employment.  *See* ECF No. 27-2 at ¶12, ECF No. 27-6 at 138:10–24, ECF No. 27-8 at ¶ 11.  Plaintiff points to suspicions among staff that Mr. Sullivan "would have been advised" about refusals to backdate documents, but these suspicions are not supported by any evidence, and instead amount only to speculation.  *See* ECF No. 28-9 at 49:10–50:1; ECF No. 98:8–25.  As a result, there is no reason to believe that Mr. Sullivan terminated her employment "because she refused" to backdate documents.  Instead, the evidence supports an inference that plaintiff was terminated because she failed to complete a required training and because of her previous disciplinary record and attitude during her final meeting with Mr. Sullivan.  ECF No. 27-2 at ¶ 11.  These facts do not rise to the level of extreme and outrageous conduct.  *See, e.g.*, *McCarty v. Kaiser-Hill Co., L.L.C.*, 15 P.3d 1122, 1126 (Colo. App. 2000) (finding insufficient evidence of extreme and outrageous conduct where the plaintiff was terminated because he filed safety concerns with management and reported wrongdoing by his foreman and coworkers).

**D.** Because plaintiff has failed to establish a genuine issue of material fact with respect to whether Mr. Sullivan engaged in extreme and outrageous behavior, defendants' motion for summary judgment on this issue is GRANTED.

### E. **False Claims Act Retaliation.**

I previously dismissed plaintiff's False Claims Act ("FCA") retaliation claim against Mr. Sullivan.  ECF No. 31.  Plaintiff also makes a claim of FCA retaliation against Boys & Girls Club.  This claim fails as a matter of law because she has not come forward with sufficient evidence to establish a *prima facie* case of retaliation.

The FCA "imposes liability on any person who 'knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval,' or 'knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.'" *McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 703 (10th Cir. 2012) (quoting 31 U.S.C. § 3729(a)(1)).  The FCA provides relief for employees who are discharged "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations of this chapter."  31 U.S.C. § 3730(h)(1).  Courts apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 41 U.S. 792, 802–03 (1973) to FCA retaliation claims.  *Armstrong v. The Arcanum Group, Inc.*, No. 16-CV-1015-MSK-CBS, 2017 WL 4236315, at *3 (D. Colo. Sept. 25, 2017).  Under that framework, the plaintiff "must establish a *prima facie* case of retaliation, and, if successful, the defendant must then articulate a legitimate, nondiscriminatory reason for taking an adverse action against the plaintiff.  The plaintiff must then produce evidence such that a reasonable fact finder could find the explanation to be pretext for discrimination."  *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981)).

To prove a *prima facie* case of FCA retaliation, plaintiff must show that 1) she engaged in protected activity; 2) Boys & Girls Club knew she engaged in protected activity; and 3) Boys & Girls Club retaliated against her because of her conduct. *U.S. ex rel. Sharp v. Eastern Oklahoma Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2013 WL 5816419, at *11 (N.D. Okla. Oct. 29, 2013). I conclude that plaintiff comes up short of establishing a triable issue at least as to the first and third prongs required to establish a prima facie case.

An employee "need not actually file a *qui tam* action" to maintain a claim, but "the activity prompting plaintiff's discharge must have been taken 'in furtherance of' an FCA enforcement action." *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996) (quoting *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)). "[T]he Tenth Circuit has not announced a standard defining 'action in furtherance of'" an FCA suit. *Armstrong*, 2017 WL 4236315, at *5. However, the Tenth Circuit has clarified that acting "in furtherance" of an FCA action entails "furthering or intending to further an FCA action rather than merely warning the defendants of the consequences of their conduct." *Ramseyer*, 90 F.3d at 1523. Moreover, another judge in this district recently followed the "consensus among the courts of appeal" dictating that "such action minimally requires that a plaintiff be investigating matters that reasonably could lead to a viable FCA case."[3] *Armstrong* at *5 (collecting four cases).

---

[3] Plaintiff urges a circumscribed version of this test that omits the emphasis on investigation and would simply include any "conduct that reasonably could lead" to an FCA case. ECF No. 28 at 15. While the First Circuit used this language in *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004), the facts of that case belie its apparently lenient standard. The First Circuit in fact found the plaintiff had not sufficiently alleged protected activity where he "pointed out to his superiors all the way up to the president" a variety of issues, including "the failure to meet regulatory standards which are required for reimbursement by Medicare and Medicaid." *Karvelas*, 360 F.3d at 237. Because the plaintiff's reporting was not "investigations, inquiries, testimonies or other activities that concern the

First, plaintiff argues that she engaged in protected activity when she "refused an order to misstate data on OJP documentation because it was a '[f]ederal crime.'"  ECF No. 28 at 16.  *See also* ECF No. 28-3 at 137:23–139:4 (recounting plaintiff's conversation with Ms. Bethel in which plaintiff asked why she must backdate, "because doing so was a Federal crime").  Plaintiff attests that she "did some research on Boys & Girls Club's obligations under the OJP program" by reading the letter of agreement describing the OJP grant and talking about her concerns with coworkers.  ECF No. 28-2 at 5.  The record indicates that she voiced her concerns about backdating to Ms. Bethel, Teen Coordinator Daniel Young, and her former colleague Lauren Hebert.  ECF No. 28-3 at 137:23–139:4; ECF No. 28-9 at 50:23–51:21.

Plaintiff did not report her concerns to Mr. Sullivan and provides no evidence that he was ever made aware of her concerns.  ECF No. 28-3 at 143:2–14.  Moreover, beyond the cursory "research" described above, plaintiff did not investigate her concerns, report her concerns to any entity outside Boys & Girls Club including law enforcement agencies, or pursue legal recourse related to her concerns.  *Id.* at 142:4–144:10.  Thus, there is no evidence that plaintiff "further[ed] or intend[ed] to further an FCA action" by voicing her refusal to backdate.  *See Ramseyer*, 90 F.3d at 1523.  Instead, the only evidence plaintiff provides is that she refused to backdate and told her supervisor and two colleagues as such.  Without more, plaintiff's allegations are insufficient "to raise the inference that she was investigating matters that reasonably could lead to a viable FCA case," and thus do not amount to "protected activity" under the FCA.  *Lipka v. Advantage Health Grp., Inc.*, 13-CV-2223, 2013 WL 5304013, at *4 (D. Kansas, Sept. 20, 2013).

---

employer's knowing submission of false or fraudulent claims for payment to the government," it did not constitute activities that 'reasonably could lead' to an FCA action.  *Id.*

Secondly, even if Plaintiff had sufficient evidence to show that she engaged in protected activity she has provided no evidence that Boys & Girls Club retaliated against her because of her conduct.  She alleges that there is a "triable issue of fact" as to whether Mr. Sullivan, who made the decision to terminate her, knew about plaintiff's "refusal to falsify documents."  ECF No. 28 at 18.  However, instead of coming forward with some evidence at this stage of the case that creates such an issue, I find that what she has is essentially speculation.

Plaintiff references Mr. Sullivan's involvement in the OJP grant process.  *Id.*  It is true that Mr. Sullivan acknowledged OJP grants on behalf of Boys & Girls Club, but there is no evidence that doing so meant he was privy to plaintiff's concerns.  *See* ECF No. 27-2 at ¶ 8; ECF No. 27-7 at 10–14.  In fact, Boys & Girls Club's development department was responsible for filling out and submitting grant applications; Mr. Sullivan's role appears to have been limited to accepting grants on behalf of Boys & Girls Club and ensuring the grant applications were submitted on time.  ECF No. 27-5 at 86:12–89:13; ECF No. 27-7 at 10–14.  Moreover, grant reports, which were the focus of Plaintiff's concerns, were "handled at the staff level" and "turned in by the development department."  ECF No. 27-5 at 92:3–5.

Plaintiff also refers to Mr. Sullivan's directive to Ms. Bethel to have her staff certify OJP grant documents.  ECF No. 28 at 18.  However, the existence of such a directive does not support an inference that Mr. Sullivan knew of plaintiff's backdating concerns.

Finally, plaintiff alludes to the "close working relationship" between Ms. Bethel and Mr. Sullivan.  *Id.*  This conclusion is merely plaintiff's deduction based on seeing "them together on a regular basis."  ECF No. 28-2 at ¶ 16.  Even if Ms. Bethel and Mr. Sullivan did have a close working relationship, this fact is not enough to conclude that Ms. Bethel must have told Mr.

Sullivan about plaintiff's concerns.  *See, e.g.*, *Armstrong*, 2017 WL 4236315, *4 (the insinuation that a party "may have apprised" the supervisor of ostensibly protected activity because those parties "communicated about personal and routine events" was mere speculation, and thus insufficient grounds for establishing a *prima facie* case of retaliation).  Thus, plaintiff's alleged triable issue of fact about Mr. Sullivan's knowledge of her concerns amounts to no more than speculation, which is not sufficient to establish a *prima facie* case of retaliation. *See Armstrong* at *5.

In fact, the record evidence supports the opposite conclusion: that Mr. Sullivan had no knowledge of plaintiff's complaints.  Mr. Sullivan testified that he made the unilateral decision to terminate plaintiff's employment after learning that she had failed to complete a required training and taking into consideration her disciplinary record and attitude.  *See* ECF No. 27-5 at 110:15–16; ECF No. 27-2 at 2.  Mr. Sullivan avers that he did not have any knowledge of plaintiff's backdating concerns during her employment.  ECF No. 27-2 at ¶ 12.  Plaintiff only informed Ms. Bethel, Young, and Hebert of her concerns, and there is no evidence that any of them informed Mr. Sullivan.  ECF No. 27-2 at 2; ECF No. 28-9 at 53:10–12; ECF No. 28-15 at 100:9–14.  Ms. Bethel asserts that she did not inform Mr. Sullivan of plaintiff's concerns, and that she did not have a hand in the decision to terminate plaintiff's employment.  ECF No. 27-8 at ¶ 11; ECF No. 27-9 at 8:12–17 (Mr. Sullivan made the decision to fire plaintiff).  In short, plaintiff is unable to point to any evidence that Mr. Sullivan was aware of her concerns about backdating or that he considered these concerns in his decision to terminate her employment. ECF No. 27-6 at 202:14–25.

Despite the lack of any evidence that Mr. Sullivan was aware of her concerns, plaintiff argues that she "satisfies the causation element by temporal proximity alone."  ECF No. 28 at 18. Courts have indeed considered the temporal proximity between an employee's ostensibly protected activity and subsequent adverse employment action.  *See, e.g.*, *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 101–102 (D.D.C. 2014); *U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1230–31 (D.C. Cir. 2012).  *See also Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 386 (10th Cir. 1984) (finding "protected conduct closely followed by adverse action may justify an inference of retaliatory motive" where "the evidence shows that [a supervisor] fired [an employee] within two hours of receiving her memo containing a raise request and a copy of the Equal Pay Act.").  However, in those cases the decision-makers had actual knowledge of the employees' protected activity.  *See* ECF No. 28 at 17–18.  As stated in *Pencheng Si*, "courts often consider the temporal proximity between *the employer's notice of the conduct* and the relator's termination."  71 F. Supp. 3d at 102 (emphasis added).  In *Pencheng Si*, the company's president terminated the plaintiff "within months of learning" that plaintiff "reported fraudulent billing practices to a board member."  *Id.*

Similarly in *Schweizer*, the plaintiff had suspicions that her company was violating the FCA.  677 F.3d at 1230.  After discussing her concerns with counsel, the plaintiff raised the issue with her supervisor's superior, indicating that he was "'her last hope in terms of . . . saving the company' from 'legal trouble.'"  *Id.*  That superior suspended her two days later, and terminated her the next week.  *Id.* at 1231.  The D.C. Circuit Court noted that being fired "less than two weeks" after this complaint to her superior "would be sufficient to support a finding" that the company "knew about Schweizer's protected conduct and fired her, at least in part, 'because of'

that conduct." *Id.* at 1240 (citing *Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C.Cir. 1998)).  Thus, unlike the case at hand, the superior who made the decision to fire the plaintiff in *Schweizer* was the very superior to whom she had brought her concerns about FCA violations.

In this case, as noted, there is no evidence that Mr. Sullivan knew of plaintiff's concerns when he made the decision to terminate her employment.  Instead, Mr. Sullivan's decision to terminate plaintiff's employment came the day after he learned about her failure to complete a required training.   ECF No. 27-2 at ¶ 11.

As a final attempt to establish causation, plaintiff argues that she need not provide evidence of "knowledge by the decision maker" under the contributing factor analysis.  Instead, she argues for application of the "subordinate bias, or 'cat's paw' theory of liability," which has been used in other employment discrimination contexts.  ECF No. 28 at 18 n.11.  Under this theory, plaintiff contends that Ms. Bethel's "actual knowledge" of plaintiff's concerns, combined with the fact that "Bethel was involved in Simmons's termination by providing information to Sullivan" satisfied the contributing factor analysis.  *Id.*

Plaintiff cites *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1137–38 (10th Cir. 2013), in which the Tenth Circuit upheld a finding that even though an employee's supervisors had no knowledge of the employee's previous ethics complaints, they were biased against her by her previous supervisor.  717 F.3d at 1137.  However, in that case there was evidence of such bias, including that one of the new supervisors "was inexplicably hostile" to the employee from their first encounter, whereas in this case plaintiff has provided no evidence that Ms. Bethel biased Mr. Sullivan against her.  *Id.* at 1138.  Moreover, plaintiff has provided no evidence of the information Ms. Bethel allegedly provided to Mr. Sullivan.  The evidence in the

record indicates only that Ms. Bethel told Mr. Sullivan plaintiff hadn't completed the required

OJP training.  ECF No. 27-5 at 105:6–24.  As the Court stated in *Armstrong* with respect to a

similar "cat's paw" theory in that case, "[t]he problem with these theories is that there is no

evidence, only speculation, that anyone told [Mr. Sullivan] what [plaintiff] had said about [her

backdating concerns].  This is not sufficient."  *Armstrong*, 2017 WL 4236315 at \*4.

Because plaintiff has not raised a *prima facie* case of retaliation, there is no need to

address her pretext argument.  Summary judgment is GRANTED on Plaintiff's FCA retaliation

claim.

### F.   Public Policy Wrongful Discharge.

Defendants next argue that plaintiff's claim for wrongful discharge in violation of public

policy must fail for the same reasons as her FCA retaliation claim.  "In general, employment

contracts are at-will and either the employer or the employee may terminate the relationship at

any time."  *Rocky Mtn. Hosp. and Medical Service v. Mariani*, 916 P.2d 519, 523 (Colo. 1996)

(citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo. 1987)).  However, Colorado

courts recognize an exception to this general rule when an employer terminates an employment

contract in violation of public policy.  *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 104–

105 (Colo. 1992).  The rationale underlying the public policy exception is "to prohibit an

employer from placing an employee in the position of keeping a job only by performing an

illegal act, foresaking [sic] a public duty, or foregoing a job-related right or privilege."  *Id.* at

109.

"An employee may state a claim for termination in violation of public policy by alleging

that she was employed by the defendant, the defendant fired her, and the defendant discharged

her '(1) in retaliation for exercising a job-related right or performing a specific statutory duty, or (2) that the termination would undermine a clearly expressed public policy.'" *Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1184–85 (D. Colo. 2016) (quoting *Underwood v. GEO Group, Inc.*, No. 10-CV-306-LTB-KLM, 2011 WL 5593150, at *15 (D. Colo. 2011)).

It is undisputed that plaintiff was employed by Boys & Girls Club, and that Boys & Girls Club fired her in March 2016. ECF No. 27 at 3, 8. Plaintiff alleges that she satisfies the third requirement because her termination violated public policy. ECF No. 28 at 19. She notes that "'Colorado has a clearly expressed public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's participation in defrauding the government.'" *Id.* (quoting *Kearl v. Portage Envtl, Inc.*, 205 P.3d 496, 499 (Colo. App. 2008)). However, as determined above with respect to her FCA retaliation claim, plaintiff has failed to provide evidence that she was terminated "in retaliation" for raising her backdating concerns or attempting to stop what she viewed as fraudulent activity. Instead, plaintiff has provided only speculation that Mr. Sullivan may have decided to terminate her based on her backdating concerns, which is insufficient to support this claim.

Because plaintiff has failed to bear her burden of providing sufficient evidence to establish a genuine issue of fact in the public policy wrongful discharge context, the defendants' motion for summary judgment on this claim is GRANTED.

## ORDER

For the reasons explained above, plaintiff's Motion for Partial Summary Judgment [ECF No. 21] is DENIED. Defendants' Motion for Summary Judgment [ECF No. 27] is GRANTED

in part and DENIED in part.  This Motion is GRANTED with respect to the third, fourth, and fifth claims for relief, and DENIED with respect to the first claim for relief.

In light of the fact that I am granting summary judgment with respect to plaintiff's outrageous conduct and public policy wrongful discharge claims, I will DENY as moot her Motion for Leave to Amend to Add Claim for Exemplary Damages [ECF No. 22], which relates to these claims.

DATED this 13th day of October, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge